IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

BLANCA CALDERÓN-ORTEGA,

    Plaintiff,

        v.                          CIVIL NO.: 11-1771 (MEL)

UNITED STATES OF AMERICA,

    Defendant.

**OPINION AND ORDER**

**I.    BACKGROUND**

On August 8, 2011, plaintiff Blanca Calderón-Ortega ("plaintiff" or "Calderón") filed a complaint against defendant United States of America ("defendant") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq*. (D.E. 1). In the complaint, plaintiff alleges that defendant's negligence in preventing and cleaning a spill at the Fort Buchanan Post Exchange store ("PX" or "the store") caused her to slip and fall.

On December 4 and 5, 2012, the court held a bench trial in the instant case. After carefully considering the evidence presented at trial and the post-trial memoranda filed by the parties (D.E. 40; 47; 48), the court determines for the reasons set forth below that defendant is not liable for any injuries resulting from plaintiff's fall at the PX.

**II.    FINDINGS OF FACT[1]**

On January 27, 2010, between 11:00 a.m. and 12:00 p.m., plaintiff entered the PX, a store owned and controlled by defendant. Approximately ten minutes later, plaintiff slipped on liquid which was on the floor in the checkout area of the PX. This occurred in the aisle where Geseny

---

[1] The following findings of fact were either taken from the joint trial stipulations (D.E. 35) or made based on the evidence adduced at trial.

Bencosme ("the cashier" or "Bencosme") was working as a cashier. Two customers had purchased a bag of ice and cases of beer, respectively, within minutes before plaintiff's fall in Bencosme's checkout aisle.

On the day of the incident, the shift manager, Marc Anthony Montalvo-Carrasquillo ("the shift manager" or "Montalvo"), had been conducting rounds between his office and the front of the store to check for spills, among other things, at intervals of twenty to thirty minutes. Montalvo had begun his shift at 10:00 a.m. Montalvo was in or around his office at the time of the incident. Upon being informed that a fall had occurred, Montalvo arrived at the checkout area within a few minutes. He offered to call an ambulance on three occasions, which plaintiff declined.

Plaintiff now has a 7% whole person impairment. After therapy and medications, plaintiff's condition has only shown partial improvement in her musculoskeletal condition.

### III.  ANALYSIS

Article 1802 of the Puerto Rico Civil Code provides for damages caused by a defendant's negligent behavior. It states that "[a] person who by act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. To state a claim for damages under this provision, the plaintiff must establish three elements: (1) a negligent or wrongful act or omission; (2) proof of damages; and (3) a causal connection between the damages and the action or omission. Vázquez-Filippetti v. Banco Popular de Puerto Rico, 504 F.3d 43, 49 (1st Cir. 2007) (citing Torres v. Kmart Corp., 233 F. Supp. 2d 273, 277-78 (D.P.R. 2002)); Ramallo Bros. Printing, Inc. v. El Día, Inc., 392 F. Supp. 2d 118, 143 (D.P.R. 2005).

Plaintiff has met the second element of Article 1802. The parties have stipulated to several aspects of plaintiff's current medical condition, including, for example, disc disease, disc

herniation, 7% whole person impairment, and evidence of degenerative changes. (D.E. 35, ¶¶ 7, 8, 13, 14). None of the stipulations, however, pertain to plaintiff's medical condition before the incident. As a result, the court must rely on plaintiff's testimony about reductions in her functionality and other physical and emotional injuries in order to come to its conclusion that plaintiff has suffered damages as a result of the incident.[2]

While it is certainly unfortunate that plaintiff has suffered injuries resulting from her fall in the PX, plaintiff must also demonstrate that defendant committed a negligent or wrongful act or omission in order to recover from defendant under a theory of premises liability. This element requires "an affirmative showing by the plaintiff that the defendant was negligent." Mas v. United States, 984 F.2d 527, 530 (1st Cir. 1993). It is plaintiff who "has the burden of proving the alleged negligence." Cotto v. C.M. Ins. Co., 16 P.R. Offic. Trans. 786, 794 (1985). "Under Puerto Rico law, a landlord is not an insurer of the safety of business visitors, and his duty extends only to the exercise of reasonable care for their protection." Figueroa-García v. United States, 364 F. Supp. 2d 140, 143 (D.P.R. 2005). "The Puerto Rico Supreme Court has stressed the fact that the owner's liability is contingent on plaintiff establishing the existence of a dangerous condition which proximately caused the injuries alleged and that the defendant had either actual or constructive knowledge of said dangerous condition." Rivera Santiago v. United States, Civ. No. 08-1266 (RLA), 2009 WL 702235, at *5 (D.P.R. Mar. 11, 2009); see also Mas, 984 F.2d at 529-30; Cotto, 16 P.R. Offic. Trans. at 794; Ramos Rosado v. Wal-Mart, 165 D.P.R. 510, 513 (2005) ("[T]he owners of commercial establishments are liable before their clients for the damages caused as a result of those hazardous conditions which are known by them or when

---

[2] Although it is uncontroverted that plaintiff experienced some injuries, it is unclear that the injuries were to the extent indicated by plaintiff at trial. For example, plaintiff testified that "the pain was unbearable" as a result of the fall, (D.E. 45, at 34:13), yet it is undisputed that she rejected the PX shift manager's offer to call an ambulance, (D.E. 46, at 122:5-8). Montalvo testified that she rejected the offer on three separate occasions. Id. In fact, plaintiff testified that she "asked him what was the use of the ambulance." (D.E. 45, at 24:19-22).

3

their knowledge is imputable.").[3] In order to establish constructive knowledge, a plaintiff must prove either the existence of the dangerous condition for an unreasonable or excessive length of time or, in the absence of evidence regarding time, the landlord's insufficient prevention policy or failure to implement the policy. See id. at 515 ("Neither did [plaintiffs] show that the alleged substance was on the floor for an unreasonable or excessive length of time or that the defendant filed [*sic*] to implement the prevention policy established in its stores.").

### A.     Actual Knowledge

First, plaintiff was unable to prove that defendant had actual knowledge of the existence of the liquid before the incident occurred. Plaintiff testified that the shift manager said to her that "from where I was, I could notice that that was wet." (D.E. 45, at 25:7-10). At trial, however, Montalvo stated that he was not aware of the existence of the liquid on the floor and that he did not tell plaintiff that he had seen the liquid. The incident report concerning the incident on January 27, 2010, prepared by Madeline Salazar, the assistant manager at the PX, after interviewing plaintiff, does not include any allegation by plaintiff that Montalvo was previously aware of the liquid. (Joint Exhibit III). Both Bencosme and Montalvo testified that, at the time of the incident, he was at or near his office, which was in the back of the store. It would strain credulity to conclude that Montalvo had seen the liquid before the incident from the area by his office. If plaintiff's recollection of the shift manager's statement is accurate, it is possible that he meant that he saw the liquid as he was walking over. Nevertheless, because of Montalvo's location before the incident, it is more likely than not that Montalvo had not seen the liquid prior to plaintiff's fall.

---

[3] The court is relying on the certified translation of Ramos Rosado found at Velázquez v. Puerto Rico Ports Auth., Civ. No. 07-1868 (FAB), D.E. 48-2 (D.P.R. Feb. 3, 2009).

Even though Bencosme was physically closer to the liquid than Montalvo, it is also unlikely that she saw it before the incident occurred. First, she testified that she had not seen the liquid. On the other hand, plaintiff did not testify to any facts that would lead the court to believe that Bencosme had seen the liquid. According to both Bencosme and Montalvo, due to the extensive cash register equipment, a cashier would be unable to see the floor where the liquid had been, even when facing the direction of the liquid. (D.E. 46, at 64:1-66:22, 139:6-17).

Finally, there was no evidence whatsoever adduced at trial that prior to plaintiff's fall someone had informed Bencosme, Montalvo, or any other employee of the PX that there was liquid on the floor. As such, without any opposing evidence presented by plaintiff, the court sees no reason to conclude that Bencosme, Montalvo, or any other store employee had actual knowledge of the liquid before plaintiff's fall.

### B.   Constructive Knowledge

#### 1.   Length of Time

The evidence adduced at trial did not prove that the liquid was on the floor for "an unreasonable or excessive length of time." Ramos Rosado, 165 D.P.R. at 515. First, plaintiff was unable to provide evidence as to how long the liquid was there. During cross-examination, plaintiff was asked several times whether she was in the PX for only five or ten minutes. Plaintiff responded that "it could have been ten minutes." (D.E. 45, at 53:5-7). Regardless, it is undisputed that plaintiff entered the PX for the purpose of purchasing two small containers of amino acids, not for the purpose of "shopping" as well. Id. at 64:8. She merely entered the store, walked to the sports section, took two containers, and walked to the area of the store with the cash registers. This is consistent with the factual inference that plaintiff was not in the store a long period of time before her fall. Moreover, plaintiff was unable to establish whether the liquid was present when she arrived ten minutes earlier. Indeed, plaintiff was only able to prove

that the liquid spilled, dripped, or otherwise accumulated on the floor *sometime* before she slipped on it.

Furthermore, although the nature of the liquid itself was in controversy at trial, under either plaintiff's or Bencosme's description of the liquid, the evidence points to the inference that the liquid was present on the floor for a short period of time. Plaintiff claims that the liquid "was like a viscous liquid with kind of a yellowish tonality," although one could not "see the color that much." (D.E. 45, at 23:7-8, 70:4-6). Bencosme testified that a customer was purchasing eight cases of Coors Light beer in her aisle at the time of the incident.[4] If a case had been leaking, it would be consistent with the contention that the liquid was yellow.

In contrast, however, Bencosme testified that the liquid was clear and that it was actually water. None of the three witnesses, including plaintiff, testified that the liquid had any smell, which is consistent with Bencosme's statement that the liquid was water. Plaintiff also testified that the liquid caused her pants and some of her sweater to be "soaking wet," such that she could see the liquid on both sides of her pants and on the floor "in a large amount." Id. at 67-69. This is more consistent with a liquid of low viscosity or density, such as water. Furthermore, Bencosme testified that "a customer had gone by with a bag of ice about two or three minutes before at the cash register." (D.E. 46, at 90:1-2). Because the customer with the cases of beer was still in the checkout aisle containing the puddle of liquid at the time of the incident, he most likely also arrived within a few minutes before the incident. Either way, a person soon before the fall bought a product consistent with the liquid on the floor. This is suggestive that the liquid was present on the floor for only a few minutes.

---

[4] Although plaintiff testified that she "was going to be the first one to reach the cash register," (D.E. 45, at 65:5-6), the court is more persuaded by Bencosme's testimony that there was a customer purchasing eight boxes of beer and four cases of wine when plaintiff fell, as the cashier would have been the one attending to the customer and thus would be more likely to remember his presence, (D.E. 46, at 60:17-21, 61:14-16).

The amount of liquid on the floor was also in controversy. At trial, plaintiff stated that she looked from the restroom area of the store and was able to see that "the liquid was still there" and that "there was quite a lot of it." (D.E. 45, at 26:13-15). This testimony is inconsistent with the diagram of the store, which demonstrates that plaintiff's vantage point would be impeded not only by the substantial distance between the restrooms and the location of the spill, but also by the placement of the cash registers, particularly cash registers #1 and #3. (See Joint Exhibit IV). This is supported by Bencosme's testimony that one is unable to see cash register #4, which was adjacent to where plaintiff fell, from the area by the restrooms. (D.E. 46, at 75:23-77:7). Thus, the court finds that plaintiff's testimony is not credible with respect to her ability to see the remaining liquid from the restrooms.

Plaintiff indicated that there was a significant amount of liquid on the floor, testifying that she was "soaking wet," her pants were "soaking wet," her sweater was also "soaked," "it was quite a lot of liquid," and there was still "a large amount" of liquid even after she fell. (D.E. 45, at 67:5-6, 68:5-7,10-14, 69:11-15). This is inconsistent with the absence of testimony that the liquid had been seen prior to the incident by other customers in the checkout area[5] or indeed plaintiff herself as she approached the checkout counter. Moreover, it is unlikely that leakage from a bag of ice or a beer can in a case would accumulate a puddle of the size described by plaintiff. Plaintiff's testimony is also inconsistent with Bencosme's testimony regarding her cleaning of the liquid, where she described the remaining liquid as a trail of quarter-sized "little drops" of water that were six inches apart. (D.E. 46, at 70:24-72:1). As such, the court

---

[5] Plaintiff mentions that there was at least one other customer, (see, e.g., D.E. 45, at 25:11-13), and Bencosme refers at least two other customers present at the time of the fall, (see, e.g., D.E. 46, at 60:19-21).

concludes by a preponderance of the evidence that there was not a significant amount of liquid on the floor.[6]

It is true that plaintiff does not have to prove with mathematical precision how long the liquid was on the floor before the incident occurred. Nevertheless, it is plaintiff's burden to prove by a preponderance of the evidence that the liquid was there for an unreasonably long period of time, and thus that defendant should have been aware of its existence, or otherwise that defendant was actually aware of a dangerous condition. Plaintiff has not met this burden. She was unable to provide evidence of how long the liquid was there. She had arrived to the store approximately ten minutes earlier, but had not seen the liquid at that point.[7] The cashier's testimony points to the inference that the liquid had only been on the floor for less than five minutes, regardless of whether the liquid was water or some other yellow liquid. The existence of liquid on the floor of a store for only a few minutes is insufficient to establish constructive knowledge. Because plaintiff is unable to "show that the liquid had been spilled on the floor for an unreasonably long time," it cannot "be argued that [defendant] should have—or could have had—knowledge about the alleged spill." Ramos Rosado, 165 D.P.R. at 517; see also Mas v. United States, 784 F. Supp. 945, 949 (D.P.R. 1992) (holding that there was an absence of evidence that defendant had actual or constructive knowledge of the hazard where "[a]ll that one can conclude from the evidence is that it was there immediately prior to the time that Plaintiff fell"), aff'd, 984 F.2d 527 (1st Cir. 1993); Boyd v. Wal-Mart Stores Inc., 255 F. App'x 34, 35

---

[6] There is no evidence that plaintiff's view of the puddle would have been obstructed, unlike Bencosme. As such, if plaintiff's testimony about the extensive puddle of yellow viscous liquid were to be fully credited, her theory of liability would run against the doctrine under Puerto Rico law that a landlord has "no obligation to protect the visitor against dangers … which are so apparent that he may reasonably be expected to discover them and be able to protect himself." Figueroa-García v. United States, 364 F. Supp. 2d 140, 143 (D.P.R. 2005). It is more likely than not that such a large puddle of liquid, allegedly visible from the restroom area even after plaintiff was soaked in the liquid, would have been so apparent that plaintiff may reasonably be expected to discover it.

[7] As will be discussed below, testimony from the shift manager corroborates that the liquid had been on the floor for less than twenty to thirty minutes.

(5th Cir. 2007) (holding that it was *plaintiff's* burden to prove that "the liquid was on the floor for such a period of time that it would have been discovered if [defendant] had exercised reasonable care" (internal quotation omitted)).

### 2. Store Policy

Plaintiff is also unable to establish defendant's liability through proving that it had constructive knowledge of the liquid on the floor due to insufficient prevention policies or its failure to implement the same. The evidence at trial shows that it was the responsibility of the shift manager to identify spills occurring near the cash registers. As an initial matter, there was no dispute at trial that it was not the cashier's primary responsibility to check or clean the floors. Bencosme stated that her primary responsibility was to attend to the customers. (D.E. 46, at 110:14-21). Montalvo explained that it was "[n]ot protocol" for a cashier to step out from behind the cash register to check for hazards. Id. at 139:14-22. Furthermore, as discussed above, both Bencosme and Montalvo testified that a cashier would be unable to see the floor where the liquid was from her position in the aisle. Montalvo, however, testified that examining the floor around the checkout area was his responsibility as shift manager. Id. at 139:21-22. If he noticed a spill on the floor, Montalvo stated that he would block off the area with cones and call for a custodian on the paging system to clean the floor. Id. at 143:8-19.

In Ramos Rosado, the store had a policy of "preventative rounds [being] done every fifteen (15) minutes." 165 D.P.R. at 517. The Puerto Rico Supreme Court held this policy to be "more than reasonable" and that one "cannot ask more of an employer." Id. at 516-17. Here, it was one of Montalvo's duties assigned by his manager to survey the checkout area every twenty or thirty minutes. (D.E. 46, at 139:22-140:1). Montalvo testified that, on the day of the incident, he actually did conduct his twenty-to-thirty-minute rounds like any other day. (D.E. 46, at 145:17-20). This evidence, as in Ramos Rosado, was offered and undisputed, and plaintiff "did

9

not prove that said period … had passed without the mentioned rounds having been effectively made." 165 D.P.R. at 517.  While preventative rounds conducted at twenty-minute intervals may also constitute sufficient store safety measures under Ramos Rosado, it is not readily apparent that thirty-minute intervals would also be sufficient.

It is plaintiff's "'obligation to put the court in a position to be able to make a clear and specific determination on negligence through the presentation of evidence to that effect.'" Ramos Rosado, 165 D.P.R. at 514 (quoting Cotto v. C.M. Ins. Co., 116 D.P.R. 644, 651 (1985)). Thus, plaintiff must show that, at least in this particular context, preventative rounds conducted every twenty to thirty minutes do not constitute "proper care to make the premises safe" such that defendant can be imputed with the knowledge of the existence of the liquid. Cotto, 16 P.R. Offic. Trans. at 793-94 (internal quotations omitted).

The incident occurred on a weekday, in the late morning, before noon.  It is disputed whether the PX—and specifically the area by the cash registers—was particularly busy at that time.  Bencosme testified that "there were a lot of people," (D.E. 46, at 85:7-8), whereas plaintiff indicated that "there almost wasn't anybody" by the checkout aisles, (D.E. 45, at 64:22-65:2). The parties provided no evidence of the dimensions or size of the store, volume of customers, or peak times.  No factual comparison with the store in Ramos Rosado or any other case has been provided.  Nor does plaintiff even provide any reasons that sweeps at twenty- to thirty-minute intervals are inadequate, where the Puerto Rico Supreme Court has held sweeps at fifteen-minute intervals to be adequate.[8]  It is not clear that plaintiff has placed the court "in a position to make a … determination" on this issue.  Cotto, 16 P.R. Offic. Trans. at 794.

---

[8] Plaintiff states that "Montalvo could not establish how long prior to plaintiff's fall did he make [sic] his last inspection of the cash registers." (D.E. 40, at 3).  Plaintiff contends in a conclusory manner that "it is impossible for defendant to establish that it took 'all possible measures' to avoid what Benscombe admitted to be a foreseeable event." Id.  It is true that there was no testimony from Montalvo or any other witness as to when precisely his last

Nonetheless, the court is not required to make such a determination in this case. Even if preventative sweeps occurring every twenty to thirty minutes do constitute a breach of a landlord's duty to its customers—a holding not reached here—plaintiff must also show a "causal nexus" between breach and damages. Soc. Gananciales v. G. Padin Co., Inc., 17 P.R. Offic. Trans. 111, 123 n.17 (1986). Because the court has determined by a preponderance of the evidence that the liquid had been on the floor for less than five minutes before plaintiff fell, it cannot be said that defendant's alleged failure to conduct sweeps at a frequency of at least once every twenty minutes—or even fifteen—is a "cause without which the [fall] could not have occurred." Black's Law Dictionary (9th ed. 2009). Defendant's alleged breach of its duty of care would not have been an actual cause of plaintiff's fall.[9] In other words, plaintiff has failed to show that defendant "ha[d] a reasonable opportunity to observe and to correct, or to warn against, the hazardous condition." Mas, 784 F. Supp. at 948. Therefore, it is unnecessary for the court to determine whether a policy of preventative rounds at intervals of twenty to thirty minutes constitutes proper care for purposes of premises liability. Furthermore, even if the court were to come to a conclusion on this issue, plaintiff has failed to place the court in a position to reach such a determination in her favor.

Plaintiff argues in her post-trial memorandum that "despite its dispensing of liquid items, the PX had no formal (or informal for that matter) *spillage-prevention* policy." (D.E. 40, at 7) (emphasis added). Plaintiff offers no alternative superior spillage-prevention policy, nor does plaintiff specify how defendant's policy is deficient. There was no evidence that the products being sold at the PX had defective or inadequate sealing—such as the plastic bags in which ice is

---

preventative round had occurred. Nevertheless, Montalvo did testify that—and it was uncontroverted that—Montalvo "conduct[ed] [his] twenty, thirty minute rounds just like any other day" on January 27, 2010. (D.E. 46, at 145:17-20).

[9] "[T]he proximate cause analysis … has two sub-elements: actual cause and foreseeability." Vázquez-Filippetti v. Banco Popular de Puerto Rico, 504 F.3d 43, 49 n.6 (1st Cir. 2007).

sold[10] or the cans in which beer is sold—and, if so, that defendant knew or should have known about it. Nor was there any testimony that liquid products at the PX were stored in such a way as to increase the likelihood that the products would fall, break, or leak. If plaintiff refers to insufficient identification or removal of spills, it seems that plaintiff contends that defendant's *slippage-prevention* policy is inadequate; that concern has already been addressed regarding sweeps conducted by the shift manager. If plaintiff seeks to impose liability for the mere fact of the location of the ice machine, plaintiff essentially calls for strict liability for accidents for any defendant which operates an ice machine inside the store. Such a sweeping requirement would be an onerous burden on stores and would violate the notion that in Puerto Rico "a landlord is not an insurer of the safety of business visitors, and his duty extends only to the exercise of reasonable care for their protection." Figueroa-García v. United States, 364 F. Supp. 2d 140, 143 (D.P.R. 2005). If plaintiff is contending, however, that defendant should have taken additional measures to prevent bags from leaking in the store, it is unclear what measures plaintiff seeks to impose. As an initial matter, plaintiff provided no evidence that there had ever been a fall due to a leaking bag of ice at the PX. In fact, Bencosme specifically stated that to her knowledge no one had ever slipped in the PX due to a leaking bag. (D.E. 46, at 94:2-6). Contrary to plaintiff's assertion that Bencosme "admitt[ed] that the store has not taken any measures whatsoever to prevent customers from walking around the store with bags of ice," (D.E. 40, at 2-3), Bencosme testified that there is "a sign that says to take the ice and take it to the cash register,"[11] (D.E. 46, at 92:2-3), and that "sometimes the Manager tells [customers] that they have to go and pay in the front" when customers get the ice and continue into the store, id. at 93:14-20. Furthermore,

---

[10] It should be noted, however, that Bencosme testified at trial that "customers sometimes get the ice and keep walking" and that, on the day in question, there was a trail of quarter-size water droplets. (D.E. 46, at 70:24-72:11, 93:14-20).

[11] There was no testimony at trial that the sign was too small, unclear, not in an obvious location, or otherwise inadequate.

12

Bencosme testified that on January 27, 2010, she had checked out a customer with a bag of ice, but that she had not seen the bag leaking or the customer walking around the store with the bag. Id. at 90:1-4, 91:21-23.  As such, plaintiff did not prove by a preponderance of the evidence that defendant had constructive knowledge of the dangerous condition.

IV.  **CONCLUSION**

It was defendant's duty in this case to protect plaintiff as a customer by ensuring a safe business environment for shopping.  The evidence at trial does not establish that defendant breached this duty.  To establish a breach of duty, plaintiff must have proven that defendant was actually or constructively aware of the dangerous condition.  Plaintiff was unable to prove that any store employee—including Bencosme or Montalvo—had actual knowledge of the existence of the liquid.  Bencosme's vantage point of the accident area was inhibited by the cash register, while Montalvo was at the opposite side of the store near his office; there was no evidence that any employee was informed of the existence of the liquid before the accident.

Plaintiff was also unable to demonstrate that defendant had constructive knowledge, either by showing that the liquid was on the floor for unreasonable period of time or that defendant's procedures for accident prevention were insufficient on January 27, 2010.  The evidence adduced at trial established by a preponderance of the evidence that the liquid was on the floor for only a few minutes before plaintiff's fall, while plaintiff produced no evidence indicating otherwise.  It was also uncontroverted that on January 27, 2010, Montalvo performed defendant's policy of having the shift manager perform a sweep of the area in question every twenty to thirty minutes, a reasonable range of time given the absence of evidence as to the particular dimensions or circumstances of the store to suggest otherwise.  Moreover, upon being informed of the incident, Montalvo arrived at the area within "a few minutes," according to plaintiff, and immediately attended to her upon his arrival. (D.E. 45, at 24:11).  Montalvo

offered to call an ambulance three times, but plaintiff rejected the offers all three times. (D.E. 46, at 122:5-8).

Tort law does not exist to compensate every person who has an accident; it exists to ensure that persons who breach their duty of care compensate their victims. In this case, defendant did not breach its duty of care towards plaintiff. For the foregoing reasons, the court finds defendant **NOT LIABLE** with respect to plaintiff's claim under the Federal Tort Claims Act.[12]

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 4th day of February, 2013.

s/Marcos E. López
U.S. Magistrate Judge

---

[12] Defendant's motion under Federal Rule of Civil Procedure 52(c) is denied as moot.